David R. MERRILL, Plaintiff,

v.

FEDERAL OPEN MARKET COMMIT-
TEE OF the FEDERAL RESERVE
SYSTEM, Defendant.

Civ. A. No. 75–0736.

United States District Court,
District of Columbia.

June 9, 1981.

Douglas L. Parker, Washington, D. C., for plaintiff.

Thomas R. Kline, Atty., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM

GASCH, District Judge.

This Freedom of Information Act (FOIA), 5 U.S.C. § 552, case is presently before the Court on the parties' cross-motions for summary judgment following remand from the United States Supreme Court. *Federal Open Market Committee v. Merrill*, 443 U.S. 340, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). Only one fairly narrow issue remains for determination by this Court; that is, does FOIA Exemption 5 authorize the Federal Open Market Committee (FOMC) to delay publication of its "Domestic Policy Directive" (DPD) until after the month in which it is effective. The parties have filed a joint statement of ma-

terial facts as to which there is no genuine issue.

## I. BACKGROUND.

The FOMC consists of the seven members of the Board of Governors of the Federal Reserve and five individuals selected from among the ranks of the executive officers of the various Federal Reserve banks. 12 U.S.C. § 263(a). The FOMC is responsible for directing the sales and purchases of government securities by Federal Reserve members in the open market. 12 U.S.C. § 263(b). The statute further requires that these transactions "be governed with a view to accommodating commerce and business and with regard to their bearing upon the general credit situation in the country." 12 U.S.C. § 263(c). The purchase and sale of government securities by Federal Reserve banks is centrally managed by the FOMC manager at the Federal Reserve Bank in New York.

The purchase and sale of securities is one way in which the Federal Reserve seeks to regulate the growth and tenor of the economy. In conjunction with reserve requirements established by the Federal Reserve Board, 12 U.S.C. § 461, FOMC activities affect the availability of funds in the economy. Financial institutions, including commercial banks, are required to hold as reserves an amount of uninvested funds equal to a proportion of their deposits. *Id.* When the FOMC desk buys securities, it credits the reserve accounts of the commercial banks (either as sellers or sellers' depositories) and thereby frees funds for use as loans or investments.[1] Sales by the FOMC desk obviously have the opposite effect, decreasing the availability of funds.[2] Thus FOMC activity is the major tool by which the Federal Reserve implements monetary policy in the economy. Moreover, any profit derived from FOMC operations is paid into the U.S. Treasury.

By statute, the FOMC is required to meet at least four times a year. 12 U.S.C. § 263(a). In practice, the FOMC meets approximately ten times a year. At these meetings, the committee considers the state of the economy and what actions will be desirable in the coming month for the purpose of attaining long term economic goals. The FOMC is required to keep detailed records of what transpires at these meetings for the purpose of making an annual report to Congress. 12 U.S.C. §§ 225a & 247a. The complete record of each meeting, the Record of Policy Actions, does not exist in final form until after the next monthly meeting at which time it is published in the Federal Register and otherwise made generally available.

At the monthly meeting, the FOMC also adopts the Domestic Policy Directive which is the subject of this action. The DPD embodies the FOMC's instructions to the account manager for executing transactions in the open market account during the coming month. The DPD typically contains a general expression of short term economic goals as well as specific tolerance ranges for certain economic indicators, the "federal funds rate" and various "monetary aggregates."[3] The manager's discretion in the daily conduct of transactions between monthly meetings is guided by the DPD and a daily conference call with the staff and at least one member of the FOMC.

The DPD, unlike the Policy statement, is prepared immediately after each meeting. It is not, however, made publicly available until it appears in the Record of Policy Actions the following month. This is in accordance with FOMC policy of maintaining the confidentiality of the DPD among a select group of individuals until it has been

---

1. Since the reserve requirement is expressed as a portion of a bank's current deposits, a change in the level of bank reserves has an amplified effect on the money supply.

2. By influencing the availability of money, these transactions also have a direct influence on interest rates.

3. The federal funds rate is the rate at which banks with excess reserves will lend money on an overnight basis to other banks for the purpose of meeting their reserve requirements. Monetary aggregates are measurements of funds available in the economy in various forms.

replaced by a more recent directive. 12 C.F.R. § 271.5.

## II. DISCUSSION.

In May 1975, plaintiff commenced this action seeking declaratory and injunctive relief in regard to the FOMC's policy of delayed disclosure. On cross-motions for summary judgment, the late Judge Waddy of this Court held that the DPD's were "statements of general policy" not within any exemption and 5 U.S.C. § 552(a)(1)(D) required their current publication in the Federal Register. *Merrill v. FOMC*, 413 F.Supp. 494, 505 (D.D.C.1976). On appeal, the United States Court of Appeals reached the same conclusion. *Merrill v. FOMC*, 565 F.2d 778, 787 (D.C.Cir.1977). Both courts rejected the FOMC's argument that the DPD was protected from disclosure by FOIA Exemption 5 in the month that it was current and operative. They concluded that the DPD embodied the final and operative policy of the FOMC for the coming month and could not be considered predecisional and deliberative. 565 F.2d at 785; 413 F.Supp. at 505. Both courts also rejected the invitation to expand Exemption 5 in such a way as to protect the DPD from current disclosure. 565 F.2d at 787; 413 F.Supp. at 506.

The Supreme Court, however, reached a different conclusion holding that a privilege from disclosure, analogous to the qualified privilege for confidential commercial information available in civil discovery under Rule 26(c)(7), Fed.R.Civ.P., was available under Exemption 5. *FOMC v. Merrill*, 443 U.S. at 359, 99 S.Ct. at 2811. Rule 26(c)(7) provides that a person or party may be granted an order "that a trade secret or other confidential research, development, or commercial information not be disclosed or only be disclosed in a designated way." Recognizing that the analogy was not exact,[4] the Court went on to note that, should the Court conclude that any form of protection would be warranted in the discovery context, it should find that the FOMC's

delayed disclosure policy was justified by this exemption. 443 U.S. at 362 n.24, 99 S.Ct. at 2813 n.24.

Having concluded that the DPD's were potentially within the scope of this new exemption, the Court framed the remaining inquiry as follows:

> Nevertheless, the sensitivity of the commercial secrets involved, and the harm that would be inflicted upon the government by premature disclosure, should continue to serve as relevant criteria in determining the applicability of this Exemption 5 privilege. Accordingly, we think that if the Domestic Policy Directives contain sensitive information not otherwise available, and if immediate release of these Directives would significantly harm the government's monetary functions or commercial interests, then a slight delay in the publication of the Directives, such as that authorized by 12 C.F.R. § 271.5, would be permitted under Exemption 5.

> *   *   *   *   *   *

> If the District Court on remand concludes that the Directives would be afforded protection, then it should also consider whether the operative portions of the Domestic Policy Directives can feasibly be segregated from the purely descriptive materials therein, and the latter made subject to disclosure or publication without delay.

443 U.S. at 363–64, 99 S.Ct. at 2813–2814 (footnote omitted).

The FOMC asserts two interests in maintaining the confidentiality of the DPD during the month that it is current, one quasi-regulatory and the other proprietary. Both are bottomed on the assertion that announcement of the FOMC's market strategy will cause exaggerated or at least different market reaction to FOMC activities than currently occurs. Defendant argues that these effects will hinder its statutory

---

4. Specifically, the Court did not conclude that all discovery privileges were available to the government under Exemption 5. 443 U.S. at 355, 99 S.Ct. at 2809. The Court also noted that a showing of particularized need by an individual litigant was not relevant to the Exemption 5 inquiry. 443 U.S. at 363, 99 S.Ct. at 2813.

mission to regulate the availability of money and also will curtail its opportunities to make a profit on its open market transactions. These contentions are supported by two affidavits prepared by Federal Reserve officials.

In response, plaintiff has offered six affidavits prepared by experts apparently taking issue with defendant's projections of the probable result of current disclosure of the DPD. Plaintiff's experts express their view that prompt publication of the DPD would result in beneficial rather than detrimental effects. If this apparent disagreement is in fact real, it would seem that summary judgment would not be appropriate at this time since material issues of fact genuinely remain in dispute.[5]

Defendant contends, however, that plaintiff's experts concede that prompt release of the DPD would have some effects on market reaction to operation of the FOMC but disagree with the FOMC whether those effects will be beneficial or detrimental. Defendant's argument continues that the latter inquiry is actually a challenge to FOMC's policy making functions which, if appropriately the subject of judicial review at all, are not subject to judicial review in this FOIA action.

Defendant has indicated that the following adverse effects might reasonably be expected to flow from prompt publication of the DPD.[6] First, the announcement effect of prompt disclosure would allow private investors to anticipate FOMC action resulting in exaggerated market response. Second, the announcement would primarily benefit large investors who are capable of promptly assessing the impact of FOMC policy and would place them at a competitive advantage over smaller investors.[7] Third, as a result of the exaggerated response, risk in government securities would increase making them less desirable to investors and consequently increasing the cost of marketing. Fourth, by revealing FOMC's market strategy, prompt publication would place the FOMC at a competitive disadvantage in the market. Finally, defendant contends that since its experience is based on its present practice prompt disclosure would, at least for some time, place it in the undesirable position of being unable to predict market response to FOMC activities from past experience.

There appears to be no consensus among plaintiff's affiants as to precisely why the FOMC's hypothesis is in error though all agree that prompt disclosure of the DPD would enhance and not hinder monetary policy. What is apparent, however, upon reviewing the affidavits is that the dispute among the experts in this case is not one over facts in any objective sense but rather is a dispute over economic theory.[8] It may in fact be finally reducible to a dispute over proper monetary policy.[9]

---

5. At a status call on December 10, 1980, the Court tentatively expressed a view that summary judgment was inappropriate on the present record and that further proceedings in the nature of an evidentiary hearing might be in order. Both parties at that time expressed apparent reluctance to embark upon an evidentiary hearing and requested an opportunity to attempt to further narrow the issues in dispute through a joint statement of material facts and further briefing.

6. Both parties apparently agree that the precise effect of current disclosure is not ascertainable since the FOMC has never in fact strayed from its present policy. Thus, the effects hypothesized in the affidavits are the product of expert conjecture.

7. Plaintiff contends that at present large investors are able to accurately interpolate FOMC policy from FOMC activities in the market. As such, plaintiffs argue that the information at issue is "otherwise available" and not therefore properly exempt under the Supreme Court's formulation. The existence of educated speculation as to the content of the DPD does not, however, amount to the availability contemplated by the Supreme Court.

8. See Joint Statement of Material Facts ¶ 77; Darby Aff. ¶ 5.

9. The Dernburg affidavit clearly illustrates that much if not all of the basic disagreement in this case is not over whether prompt disclosure would cause what the FOMC considers to be an adverse effect on its operations but whether those effects which the FOMC considers adverse would in the long run enhance the operation of the economy. In a rather telling passage, affiant Dernburg states:

■ At bottom, the FOMC has concluded that uncertainty in the monetary markets best serves its needs.[10] Admittedly, in reaching this conclusion, the FOMC was required to choose between competing economic theories and competing economic policies. While Congress has entrusted the FOMC with making such determinations, it is at once apparent that this Court is an inappropriate forum for weighing the wisdom of the FOMC's choice.[11] This is particularly true in the context of this FOIA case.[12]

■ Even assuming, however, that a material factual dispute exists over whether prompt release of the DPD would help or hinder the FOMC in pursuing sound monetary policy, no credible evidence has been

> The essential point is that the source of the instability is not the practice of full disclosure, it is, rather, a mistaken approach to monetary policy. So much the better if disclosure helps to discredit and force the abandonment of such policy.
> Dernburg Aff. ¶ 16.

10. *See* Sternlight Aff. ¶¶ 8 & 10.

11. This Court's reluctance to inject its judgment into policy matters Congressionally entrusted to an administrative decisionmaking body with special expertise in the area in question is of course well supported by cases arising in other contexts. *See, e. g., Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566–69, 100 S.Ct. 790, 797–799, 63 L.Ed.2d 22 (1980); *Ethyl Corp. v. EPA,* 541 F.2d 1, 20–23 (D.C. Cir.), *cert. denied,* 426 U.S. 941, 96 S.Ct. 2663, 49 L.Ed.2d 394 (1976); *American Meat Inst. v. Bergland,* 459 F.Supp. 1308, 1316 (D.D.C.1978). It should also be observed that individuals seeking to challenge FOMC operations in the courts have generally not fared successfully for one reason or another. *See, e. g., Reuss v. Balles,* 584 F.2d 461 (D.C.Cir.), *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978); *Raichle v. Federal Reserve Bank,* 34 F.2d 910 (2d Cir. 1929); *Bryan v. FOMC,* 235 F.Supp. 877 (D.Mont.1964). The Court is not unmindful of its statutory duty to review *de novo* agency claims of exemption under the FOIA. *See* 5 U.S.C. § 552(a)(4)(B); *Department of Air Force v. Rose,* 425 U.S. 352, 379, 96 S.Ct. 1592, 1607, 48 L.Ed.2d 11 (1976). It should, however, also be noted that in FOIA cases arising in other contexts, notably those involving matters of national security, the courts have frequently noted an appropriate measure of deference to agency expertise. *See, e. g., Halperin v. CIA,* 629 F.2d 144, 147–48 (D.C.Cir.1980); *Lesar v. United States Depart-*

offered by the plaintiff to controvert the defendant's assertion that premature release of the DPD would harm the government's commercial interest in profitably trading in government securities.[13] As the largest active participant in the government securities market, the FOMC, through its actions, exerts a major influence on the price of government securities in the open market. As explained in the affidavit of Governor Partee:

> To the extent that speculators anticipate the actions of the Account Manager, they will tend to buy when they expect the Manager to buy, in order to profit from any increase in prices occasioned by the Manager's actions; and they will sell

*ment of Justice,* 636 F.2d 472, 481 (D.C.Cir. 1980); *Hayden v. NSA,* 608 F.2d 1381, 1388 (D.C.Cir.1979), *cert. denied,* 446 U.S. 937, 100 S.Ct. 2156, 64 L.Ed.2d 790 (1980). While these cases have drawn their conclusions from specific legislative history, it is apparent that the logic in those decisions is equally applicable here where information itself plays a unique and vital role in the agency's statutorily entrusted duties. The Court is aware that this argument potentially proves far too much. Since agency decisions to withhold information are presumably rational, it could perhaps be argued in every case that the agency has made its decision in order to accomplish some prescribed goal. It should be apparent, however, that the present case is unique and the present holding limited to these particular facts.

12. Were plaintiff able to obtain judicial review of the exercise of specific FOMC policy, the burdens of persuasion imposed would be decidedly different than those in this FOIA case. *Compare* 5 U.S.C. § 552(a)(4)(B) *with* 5 U.S.C. § 706.

13. The term commercial interest as used in this case encompasses two different concepts. The first is the cost to the government of marketing its securities which defendant argues would increase due to rapid and uncertain fluctuation in interest rates. That aspect of the government's commercial interest has already been addressed. The second aspect of the government's commercial interest involves profits paid into the U.S. Treasury from FOMC operations. The defendant argues that in this regard the government would suffer competitive injury from contemporaneous market competition in the purchase and sale of government securities.

when they expect the Manager to sell, in order to minimize losses resulting from lower prices occasioned by the Manager's selling. Such increased contemporaneous competition may well require the Manager to pay a higher price when he buys securities, and to accept a lower price when he sells, than would otherwise be necessary.

Partee Aff., ¶ 54. Plaintiff's own affidavits tend to support the major premise on which this argument is based; that is, release of the DPD in the month that it is current would cause market participants to move in concert with the FOMC. Plaintiff's only argument in opposition to defendant's assertion on this issue is that the FOMC, unlike other traders, is not primarily concerned with making a profit. But although profit on transactions in government securities may be an incidental facet of the FOMC's activities, it is nevertheless a matter which is properly considered in the present case. *See FOMC v. Merrill*, 443 U.S. at 363–64, 99 S.Ct. at 2813–2814. Because by its uncontroverted affidavit the defendant has shown that release of the DPD could be expected to diminish the profitability of FOMC activities in the open market, summary judgment is appropriately granted on that basis.

The Court has determined that, to the extent plaintiff's affidavits contradict those offered by the defendant, the disagreement is over economic theory and perhaps economic policy. Insofar as judgments pertaining to the validity of a particular economic theory or the wisdom of a particular policy are entrusted to the FOMC under the auspices of Congress, the Court lacks the expertise necessary to substitute its judgment or that of plaintiff's experts for that of the FOMC. Moreover, it appears beyond dispute that current disclosure of the DPD would diminish the profitability of FOMC transactions in government securities in the open market.

█ Thus having concluded that FOIA Exemption 5 authorizes the FOMC's delay in publishing the "operative portion" of the DPD, the question remains whether "the

purely descriptive materials" may be segregated and published currently. *FOMC v. Merrill*, 443 U.S. at 364, 99 S.Ct. at 2814. Unlike the typical FOIA case, the actual content of the documents in question in this case is not in dispute. Samples of a number of DPD's from prior periods have been filed as exhibits to the affidavit of Governor Partee and are otherwise generally available to the public. A review of those documents illustrates that the degree to which the documents discuss objective factual data from prior months varies considerably from document to document. By the same token, the extent to which particular information would likely tend to indirectly reveal the operative portion of the DPD varies from document to document. No set rule could be laid down to govern the release of segregable nonexempt portions.

Aside from this practical difficulty, there is another reason for the Court's reluctance to order release of any portions of the Domestic Policy Directive. All of the objective factual information contained in the DPD is otherwise publicly available. To the extent that this information is publicly available, there is little if any independent interest in its disclosure in this form. The only interest in its disclosure in this form arises out of the fact that it would reveal the information that the FOMC thought significant in formulating the operative portion of the DPD. Thus, release of this information is significant only to the extent that it would compromise information which is otherwise exempt. For the above reasons, the Court has concluded that purely factual portions of the DPD cannot, as a practical matter, be published without delay.

III. CONCLUSION.

For the foregoing reasons, the Court has concluded that current release of the DPD would cause harm to the government's monetary and commercial interests. While the plaintiff's affiants appear at first blush to raise genuine factual issues, it is apparent upon a careful review of those affidavits that the actual dispute is over economic theory and monetary policy and is therefore

not an appropriate subject for this Court's determination. Moreover, plaintiff has offered no rebuttal to defendant's assertion, supported by affidavit, that release of the DPD would harm the government's commercial interest in profitably dealing in government securities. Finally, it is apparent that the only significant interest in the release of factual information in the DPD is based on the possibility that its present form would tend to reveal the operative portions of the document. Accordingly, the Court will grant defendant's motion for summary judgment.